# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LISA ANN STOPA,
     Plaintiff,

     v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,
     Defendant.

No. 3:17-cv-00934 (SRU)

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In the instant Social Security appeal, Lisa Ann Stopa ("Stopa") moves to reverse the decision by the Social Security Administration (SSA) denying her disability insurance benefits. The Commissioner of Social Security moves to affirm the decision. The issues presented are whether: (1) the ALJ's step three analysis was legally inadequate; (2) the ALJ erred in her credibility analysis; and (3) the ALJ failed to evaluate Stopa's anxiety. Mem. Supp. Mot. Reverse, Doc. 21-1, at 1 – 2.

For the following reasons, Stopa's motion for an order reversing and remanding the ALJ's decision is denied, and the Commissioner's motion for an order affirming that decision is granted.

## I.     Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e.,

an impairment that limits his or her ability to do work-related activities (physical or mental).  *Id.* (citing 20 C.F.R. §§ 404.1520(c), 404.1521).  Third, if the claimant does not have a severe impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations.  *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record."  *Id.*  (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)).  "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment."  *Id.*  Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work."  *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)).  Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy."  *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)).  The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria.  *See Id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry.  *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418.  If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five.  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).  At step five, the Commissioner need only show that "there is work in the national economy that the claimant can

do; he [or she] need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374-75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447-48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.    Background

Lisa Ann Stopa ("Stopa") applied for Social Security disability insurance benefits on October 11, 2013, alleging an onset date of October 26, 2012. *See* ALJ Decision, R. at 27. Stopa identified her disability as being due to the following illnesses and conditions: back injury, annular tear lumbar disc, ruptured discs, degenerative joint disease, sciatica, peripheral neuropathy, disc protrusion, bilateral neuroforaminal stenosis, chronic lumbar radiculopathy, and

degenerative spondylosis throughout lumbar spine.[1]  *See* Disability Determination Explanation (Initial), R. at 109.

The SSA initially denied Stopa's claim on January 3, 2014, finding that although her "condition results in some limitations in [her] ability to perform work-related activities . . . [the] condition is not severe enough to keep [her] from working."  Disability Determination Explanation (Initial), R. at 120.  The SSA adhered to its decision upon reconsideration on April 9, 2014.  ALJ Decision, R. at 27.  In the agency's view, Stopa "is capable of performing light work as defined in 20 CFR 404.1567(b), except she is able to perform occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs."  *Id.* at 32.

Stopa requested a hearing with an ALJ, which was held on January 8, 2016.  Gary W. Huebner, Stopa's attorney, questioned Stopa about her back injury.  Stopa reported that she feels constant back pain and numbness down to her left foot and ankle.  *Id.* at 65.  She also reported that her symptoms are "an everyday, 24-hour a day thing."  *Id.*  She testified that she has undergone "a series of injections, treatment, [and] physical therapy."  *Id.* at 63.  According to Stopa, the injections and the physical therapy resulted in a worsening of her symptoms.  *Id.* at 64.  Stopa reported that she requires Lidoderm patches, Valium, ibruprofen, and range of motion exercises to control her pain.  *Id.* at 71-75.  Stopa also testified that she experiences migraine headaches about two to three times a month.[2]  *Id.* at 69.  According to Stopa, the migraines may last anywhere from a few hours to an entire day.  *Id.*  She reported using Advair and Flonase for asthma, which she claims alleviate her asthma symptoms.  *Id.* at 70.  She also testified that she

---

[1] Additionally, Stopa claimed to suffer from other miscellaneous ailments, such as, digestive problems, difficulties with personal care and memory problems.  *See* Disability Determination Explanation (Initial), R. at 104.  In her initial application, however, Stopa's claim did not include issues with mental health impairment or limitations.  The record reflects that a conversation took place on December 5, 2013, between Stopa and Pamela Armstrong, an agency employee, during which Stopa told Armstrong "that her claim is physical only . . . [and] mental health is not currently an impairment."  Disability Determination Explanation (Initial), R. at 113.

[2] The ALJ clarified that the report dated May of 2014, identified headaches as the diagnosis, not migraines.

"didn't really work much in 2012" because of stress, both at home and at work. *Id.* at 73.
During closing arguments, Stopa's attorney raised the issue of anxiety, for the first time, when he
referred to the "limitations imposed by the headaches and the depression and anxiety that she's
treating with Dr. Tobin." *Id.* at 106. Stopa testified that she suffered from migraines and was
prescribed medication for stress, however, she never specifically mentioned either depression or
anxiety.

Administrative Law Judge I. K. Harrington questioned Stopa about the nature of her most
recent work activity in the areas of "medical billing, office management, consulting and
computer setup." *Id.* at 91. Stopa testified that she spent most of her time, "[a]nywhere from six
to ten hours a day," performing medical billing work. *Id.* According to Stopa, medical billing
occurs mostly from a seated position in front of a computer, occasionally lifting 20 to 25 pounds.
*Id.* at 92. The ALJ asked Stopa about the activities involved with homeschooling her two
younger children, particularly asking about the length of a typical school day. Stopa replied that
education time starts around 10:00 A.M., and continues until her oldest daughter is home from
school. She and the children "play games a lot . . . [she] teach[es] them math and reading and
science . . . and occasionally [they] go on a field trip."[3] *Id.* at 85.

The ALJ then heard testimony from John Matzilevich, a vocational expert, who testified
that Stopa had been employed as a medical records coder and office manager, which he
classified as sedentary work. *Id.* at 102. Matzilevich then responded to hypotheticals put forth
by the ALJ. In the first hypothetical, the ALJ asked Matzilevich to assume "an individual with
[Stopa's] age, education and past work experience [who] is capable of the full range of light
work with occasional balancing, stooping, kneeling, crouching, crawling; climbing ramps and

---

[3] As part of her curriculum, Stopa takes the children on a field trip about once a month. Tr. of ALJ Hr'g, R. at 85.

stairs; never climbing ladders, ropes or scaffolding; avoid[ing] concentrated exposure to hazardous conditions, such as unprotected heights and dangerous moving machinery." *Id.* at 99. Matzilevich opined that "[t]he jobs of medical record[s] coder and office manager could be performed [by Stopa] as customarily performed." *Id.* Because Stopa self-reported that she occasionally had to lift up to 100 pounds in her previous work, Matzilevich opined that she could not return to her past work as medical records coder or office manager, as actually performed. *Id.* The ALJ then asked Matzilevich if there were jobs in significant numbers in the national and regional economy that Stopa could perform given the limitations set forth in the hypothetical. Matzilevich testified that Stopa could perform the jobs of marker, sales attendant or photocopying machine operator, which are classified as skill level 2 jobs with light exertional levels. Tr. of ALJ Hr'g, R. at 102 – 03. In the second hypothetical, the ALJ asked Matzilevich to assume the following:

> [A]n individual of [Stopa's] age, education and past work experience. Further assume such individual is capable to lift up to ten pounds occasionally [and] lift and carry up to ten pounds occasionally. Such individual can sit, stand and walk ten minutes without interruption . . . and in a total eight-hour workday, can sit up to two hours, stand and walk for one hour. Such individual can frequently reach, handle, finger, feel, push, pull with . . . both upper extremities [and] occasionally operate foot controls. Such individual can occasionally climb ramps and stairs; never climb ladders, ropes or scaffolding; occasionally balance; never stoop, kneel, crouch or crawl; and such individual can never work around unprotect[ed] heights; occasionally around moving mechanical parts or operating a motor vehicle or exposure to humidity and wetness; no exposure to dust, odors, fumes, pulmonary irritants, extreme cold, heat [and] vibrations. . . ."

Tr. of ALJ Hr'g, R. at 103 - 04. In response, Matzilevich opined that, given the limitations of the second hypothetical, "none of [Stopa's] past work could be performed . . . [and] there would be no other work" for her. *Id.* at 104.

Stopa's counsel then examined the vocational expert.  He asked Mr. Matzilevich how much walking and standing was involved in the three identified occupations.  *Id.* at 105.  Matzilevich stated that the occupations would require about six hours of standing and walking.  Additionally, the claimant would be expected to sit for approximately two hours.  The jobs require occasionally lifting 20 pounds, and frequently lifting ten pounds. *Id.*

On July 23, 2015, the ALJ issued an opinion finding that Stopa "has not been under a disability, as defined in the Social Security Act from October 26, 2012, through the date of this decision." ALJ Decision, R. at 39. The ALJ determined that, "based on the testimony of the vocational expert . . . [Stopa's] impairments, although severe, do not restrict her capacity to such a degree that she is precluded from performing her past relevant work as a medical records coder," as generally performed.  ALJ Decision, R. at 37.  "In the alternative, considering [Stopa's] age, education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that [Stopa] can perform (20 CFR 404.1569 and 404.1569(a))." *Id.* at 38.

At the first step, the ALJ found that Stopa "has not engaged in substantial gainful activity since October 26, 2012, the alleged onset date." *Id.* at 29. At the second step, the ALJ found that Stopa's degenerative disc disease and asthma were "severe impairments" under 20 C.F.R. §§ 404.1520(c).[4]  *Id.* at 30.  At the third step, the ALJ determined that

---

[4] The ALJ found that Stopa has several "non-severe" additional impairments, including "depressive disorder, migraines, and hyperlipidemia." ALJ Decision, R. at 30.  The ALJ ruled that depressive disorder, migraines, and hyperlipidemia were non-severe impairments as they "[did] not cause more than minimal limitation in the claimant's ability to perform basic mental work activities." *Id.*  Nonetheless, the effects of the non-severe impairments were taken into consideration when the ALJ determined Stopa's residual functional capacity. *Id.* at 31.

Stopa's impairments were not per se disabling because Stopa "d[id] not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 31.

The ALJ then assessed Stopa's residual functional capacity, and found that she could "perform light work" with certain limitations. *Id.* at 32. Those limitations were as follows: (1) Stopa could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs with no ability to climb ladders, ropes and scaffolds; (2) she must avoid concentrated exposure to vibrations, fumes, odors, dust, gases and poor ventilation; and (3) she could not be exposed to hazardous conditions such as unprotected heights and dangerous moving machinery. *Id.*

The ALJ concluded that Stopa could perform "past relevant work as a medical records coder as generally performed." ALJ Decision, R. at 37. The ALJ found that "there are other jobs existing in the national economy that she is also able to perform." *Id.* The ALJ based that decision on Stopa's residual functional capacity in conjunction with the Medical-Vocational Guidelines and determined that a finding of "not disabled [was] therefore appropriate under the framework" of Medical-Vocational Rule 202.21. *Id.* at 39.

Stopa requested a review of the ALJ's decision, and the Appeals Council denied that request on April 11, 2017. Court Transcript Index, R. at 1.

A. Medical Evidence

1. *Back Pain*

The first reference to the injury that resulted in Stopa's back problem is an October 31, 2012, entry by Dr. Steven M. Luster, in which he ordered an MRI for further evaluation. *See*

Exhibit 1F, Dr. Steven M. Luster Transcription, R. at 388. The MRI of the lumbar spine showed a disc bulge at the L4–L5 level with minimal spinal canal stenosis and mild bilateral neural foraminal narrowing, and a small central disc protrusion without significant spinal canal stenosis and mild bilateral neural foraminal narrowing at the L5-S1 level. *Id.* at 389. The radiologist's impression was "mild degenerative disease at L4-5 and L5-S1 levels." *Id.*

On November 9, 2012, Stopa was seen by Dr. Joseph Sohn, an orthopedic surgeon. Dr. Sohn notes that an x-ray of the lumbar spine showed mild degenerative spondylosis throughout the lumbar spine with overall good alignment. Exhibit 15F, Dr. Joseph M. Sohn, Treatment Note, R. at 785. Dr. Sohn recommended epidural steroid injections to alleviate symptoms. *Id.* On December 3, 2012, Stopa returned to Dr. Sohn, who ordered a CT myelogram of the lumbar spine for further evaluation, and an electromyogram ("EMG") study to rule out polyneuropathy. *Id.* at 786. The myelogram revealed mild, degenerative changes of the lower lumbar spine. *Id.* at 787. The EMG confirmed chronic lumbar radiculopathy, mild to moderate, with no findings for acute or subacute lumbar radiculopathy. *Id.* at 788. On December 19, 2012, a CT scan of Stopa's lumbar spine showed mild degenerative changes. *Id.* at 787.

On January 7, 2013, Stopa reported low back pain to Dr. Timothy A. Tobin, her primary care physician of approximately nineteen years. Exhibit 7F, Dr. Timothy A. Tobin, Treatment Record, R. at 598. During that visit, Dr. Tobin prescribed medications for asthma, bronchitis, and back pain. On January 28, 2013, Stopa returned to Dr. Tobin for treatment of "worsening . . . asthma . . . cough, congestion and facial pain and swelling." *Id.* at 596. There was no mention of back pain during the visit. On February 4, 2013, Stopa returned to Dr. Tobin complaining of stress, asthma, and back pain. *Id.* at 595. Dr. Tobin diagnosed asthma and acute sinusitis and prescribed medication.

The following month, Stopa treated with Dr. John Beiner of Connecticut Orthopedic Specialists. Dr. Beiner noted that Stopa "demonstrat[es] a dynamic angular instability at L4-L5, but no atherolisthesis . . . [and] no spondylolysis. There is no obvious neuron impingement on the myelogram." Exhibit 8F, Dr. John M. Beiner, Treatment Notes, R. at 691. In light of Stopa's "acute pain," Dr. Beiner approved a course of physiotherapy and pool exercises. *Id.* Treatment with facet blocks was also discussed. Physical therapy notes from March 26, 2013, indicate a "high level of pain," however, the "[patient] does fairly well with . . . pain modulation exercise." Exhibit 17F, Physical Therapy Re-Evaluation, R. at 833.

On November 12, 2013, Stopa was evaluated by Dr. John Paggioli, a pain specialist who recommended "a level 2 fusion, given that she has failed multiple forms of conservative treatment." Exhibit 9F, Dr. John J. Paggioli, Treatment Notes, R. at 693. Dr. Paggioli also found "exaggerated responses [that] may be a sign of anxiety and wanting to be believed." *Id.* Dr. Paggioli noted that "[s]he had many Waddell's signs . . . [including] jump sign[s] when areas of her low back were pressed lightly."[5] *Id.*

On December 17, 2013, Stopa was evaluated by Dr. Peter Whang, who found that she had "severely limited range of motion of her lumbar spine." Exhibit 11F, Dr. Peter G. Whang, Provider Notes, R. at 738. During the visit, Stopa also demonstrated a positive result in a straight leg raising test. Stopa's recent MRI, however, "was essentially unchanged compared to [the] last MRI performed one year ago." *Id.* at 739. During a return visit in February, Dr. Whang noted that Stopa's "mobility is quite limited," and recommended surgical intervention;

---

[5] "Waddell's signs are indications that a patient's response to certain movements is inappropriate or unexpected, such as yelling out in pain in response to a very light touch." *Germain v. Astrue*, 2013 WL 587369, at *5 n. 6 (N.D.N.Y. Feb. 12, 2013) (citation omitted).

"although [he] is unclear exactly where her pain is arising from." Exhibit 21F, Dr. Peter G. Whang Assessment Letter, R. at 982.

In August of 2014, Stopa returned to Dr. Tobin. During the visit, Stopa reported that she was feeling well. The medical record indicates that "[s]he continues to have the back pain but [it] is not as severe as it was previously." Exhibit 21F, Dr. Timothy Tobin, Progress Note, R. at 966. During the visit, Stopa reported that she swam frequently with her children, which was "a good activity for her back." *Id.* During a follow-up visit in October, Stopa reported that her back discomfort was under control. *Id.* at 964. In November, Stopa reiterated that she felt well, and her chronic back pain was manageable. *Id.* at 960. In February of 2015, Stopa reported feeling back pain. Stopa told Dr. Tobin that she used "percocet only sparingly and she [had] been using heat and doing her ROM exercises." *Id.* at 958. On April 6, 2015, Stopa experienced a set-back when she hit her tail bone after going down a children's slide. Dr. Tobin ordered a lumbar MRI and x-rays of her sacrum and coccyx. The x-rays were negative. Exhibit 22F, Radiology Report, R. at 1042. The MRI showed "[n]o significant stenosis or foraminal compromise [and] no significant change." Exhibit 21F, Radiology Report, R. at 1035.

2. *Anxiety*

Stopa first sought treatment for anxiety issues on March 16, 2012, when she treated with Suzanne Arcuni, APRN ("Arcuni"), who diagnosed her with generalized anxiety disorder. Exhibit 7F, Suzanne Arcuni, APRN, Progress Note, R. at 610. Arcuni prescribed Xanax and discussed general coping strategies to treat Stopa's anxiety and panic attacks. *Id.* At a follow-up visit two weeks later, Stopa reported "feeling anxious, without panic attacks." *Id.* at 608. During the visit, Arcuni refilled Stopa's Xanax prescription. On February 4, 2013, Stopa saw her primary care physician, Timothy A. Tobin, M.D., and reported feeling "a lot of stress in the

home recently;" however, there is no indication that Dr. Tobin either prescribed or refilled her anxiety medication during the visit. Exhibit 7F, Dr. Timothy Tobin, Progress Note, R. at 594. On March 11, 2013, Stopa returned to Dr. Tobin, who diagnosed her with depression, and prescribed an antidepressant. *Id.* at 589 – 90. The following month, Stopa returned for a follow-up visit. During the examination, Stopa reported feeling "overwhelmed by the stresses in her life." *Id.* at 585. Stopa had begun treating with a counselor, whom she found helpful. Stopa was instructed to continue taking Valium and the antidepressant, and to continue working with her therapist. *Id.*

During a visit to Dr. Tobin on May 13, 2013, Stopa reported feeling chest pain. *Id.* at 582. Dr. Tobin noted that Stopa was "still under a lot of stress at home." Dr. Tobin instructed Stopa to continue taking her medications and treating with her therapist. *Id.* at 583. At a follow-up visit two weeks later, Stopa's treatment plan remained unchanged. *Id.* at 580. On July 25, 2013, Stopa visited Dr. Jay Zimmerman, a gastroenterologist, and reported that she developed severe anxiety and panic reactions as a result of a traumatic experience that occurred in March of 2012. Exhibit 5F, Dr. Philip Jaffe, Treatment Notes, R. at 452.

In August, Stopa visited Dr. Tobin who noted that "most of her symptoms . . . are all related to her anxiety." Exhibit 7F, Dr. Timothy Tobin, Progress Note, R. at 573. In September of 2013, Stopa reported that her "stress [was] beginning to settle down [and] she did not feel overwhelmed by the stress." *Id.* at 569. During the visit, Stopa asked Dr. Tobin to discontinue the antidepressant. *Id.* On November 20, 2014, Stopa reported "feeling well . . . [and] [t]he stress she has had over the years has not been as bad recently." Exhibit 21F, Dr. Timothy Tobin, Progress Note, R. at 960. On February 20, 2015, at a follow-up visit with Dr. Tobin, Stopa

reported that she was better able to cope with stress. *Id.* at 958. At some point between September of 2013 and February of 2015, Stopa resumed the antidepressant medication. *Id.*

B. Issue One – Back Pain

1. *Was the ALJ's finding that Stopa did not meet or equal the requirements of Listing 1.04 supported by substantial evidence?*

Stopa challenges the ALJ's treatment of the "objective medical evidence" on two fronts. Mem. Supp. Mot. Reverse, Doc. No. 21-1, at 3. First, Stopa argues that the ALJ failed to consider "two subsequent lumbar MRIs that demonstrate a worsening of [her] condition." Second, she argues that the ALJ's finding of "mild degenerative disc disease at L4-5 and L5-S1" is contrary to the medical evidence because the ALJ based her opinion solely on an MRI report from November of 2012. Mem. Supp. Mot. Reverse, Doc. 21-1, at 6. The Commissioner responds that the "objective medical evidence does not support [Stopa's] allegations of disabling back pain." Mem. Supp. Mot. Affirm, Doc. No. 22, at 11.

The Commissioner cites to specific medical evidence[6] in the record that supports the ALJ's conclusion that Stopa did not meet the requirements of Listing 1.04, including Stopa's own testimony about her daily activities.[7] *Id.* In her decision, the ALJ described some of the factors relevant to the decision, including a lengthy recitation of treatment notes, and medically acceptable clinical and laboratory diagnostic techniques. ALJ Decision, R. at 33. Most notably,

---

[6] "Here, the objective medical evidence does not support Plaintiff's allegations of disabling back pain. For instance, x-rays of Plaintiff's lumbar spine revealed mild degenerative spondylosis throughout with overall good alignment and a CT scan of the lumbar spine showed only mild degenerative changes. Similarly an MRI of the lumbar spine revealed only mild degenerative disc disease with minimal spinal and bilateral foraminal stenosis. Also, an EMG study revealed possible mild-to-moderate lumbar radiculopathy with neither acute nor subacute lumbar radiculopathy. Moreover, x-rays of Plaintiff's sacrum and coccyx were unremarkable." (Mem. Supp. Mot. Affirm, Doc. No. 22 at 11) (internal citations omitted).

[7] "Plaintiff stated that she took care of her three children, drove them to and from school, helped them with homework, and prepared them simple meals. Plaintiff further stated that she shopped in stores for groceries and prescription medications, attended medical appointments, and attended church services." (Mem. Supp. Mot. Affirm, Doc. No. 22 at 11) (internal citations omitted).

the ALJ cites to an "MRI of the lumbar spine from April 11, 2015, [that] revealed retrolisthesis with a central protrusion at L5-S1, with no significant spinal stenosis or foraminal compromise." ALJ Decision, R. at 34.  Stopa argues that the ALJ failed to evaluate whether the MRI evidenced a progression or worsening of her condition.  I agree.  The ALJ failed to articulate her consideration of the progression or worsening of Stopa's condition.  The Second Circuit has held, however, that remand of an administrative appeal is "futile . . . when overwhelming evidence in the record makes it clear that the same decision is inevitable." *Zhong v. U.S. Dept' of Justice*, 480 F.3d 104, 117 (2d Cir. 2006); see also *McIntyre*, 758 F.3d at 148 (applying harmless error analysis to Social Security appeal).  Here, for instance, the MRI of the lumbar spine from April 11, 2015, found "no significant change" to Stopa's condition.  Exhibit 21F, Middlesex Hosp. MRI, R. at 1035.  Although the second MRI dated December 6, 2013 is not in the record, Stopa correctly notes that Dr. Peter Whang reviewed the study and concluded that Stopa had "moderate disk degeneration at L4-L5 and L5-S1 with some annular tears."  Exhibit 11F, at 739. The medical report also showed that there was no significant compression of the nerves, and the "study was essentially unchanged compared to [the] last MRI performed 1 year ago," which would seem to negate Stopa's claim that her condition had worsened.  Exhibit 11F, at 739. Because neither MRI demonstrates that Stopa's condition deteriorated between November of 2012 and April of 2015, it appears that a reevaluation of the MRI reports would not change the result reached by the ALJ.  Accordingly, I conclude that the ALJ's failure to fully articulate her consideration of the two MRI's is harmless.

Initially, the burden of establishing that a condition meets or equals one of the listed impairments rests with Stopa.  *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000).  To meet her burden, Stopa must show that her impairment "matches a listing, [and] it [meets] all of the

specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Section 1.04, for example, requires compromise of a nerve root or the spinal cord with one or more of the following:

> (a) [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); (b) [s]pinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or (c) [l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively.

20 C.F.R. Pt. 404, Subpt. P, App. 1. Stopa asserts that the ALJ failed to adequately consider evidence in the record that supported her "allegations of functional limitations caused by her back condition." Mem. Supp. Mot. Reverse, Doc. 21-1, at 3. In support of that allegation, Stopa refers to the opinions of several treating physicians: Dr. Peter Whang, Dr. Joseph Sohn, Dr. John Beiner, and Dr. John Paggioli. I will address each of those concerns in turn but first note that the ALJ was not required to mention or discuss every single piece of evidence in the record. *Schneider v. Colvin*, 2014 WL 4269083, at *4 (D. Conn. Aug. 29, 2014); s*ee Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981). Where "the evidence of record permits [the court] to glean the rationale of an ALJ's decision, [the ALJ is not required to explain] why [s]he considered particular evidence unpersuasive or insufficient to lead [her] to a conclusion of disability." *Mongeur*, 722 F.2d at 1040.

At step two of the sequential analysis, the ALJ determined that Stopa's degenerative disc disease was a severe impairment. The ALJ concluded, without detailed explanation, that "[Stopa's] condition [did] not satisfy the severity requirements of this listed impairment, as she does not have the requisite neurological deficits." ALJ Decision, R. at 31. Stopa argues that her "back condition may meet or equal the listing with or without neurological deficits." Mem. Supp. Mot. Reverse, Doc. 21-1, at 7. Stopa points to a segment of Dr. Whang's treatment notes, where Dr. Whang determined that the December 2013 MRI evidenced moderate disc degeneration. Exhibit 11F, Dr. Peter G. Whang, Treatment Note, R. at 739. That same record, however, notes that there is no "significant nerve compression evident in her lumbar spine." *Id*. Dr. Whang also notes that Stopa "reports grossly intact motor and sensory function in both lower extremities." *Id.* at 738. A sensory examination of Stopa's extremities showed normal muscle tone "with no masses [or] asymmetric atrophy/hypertrophy." *Id*. Although there is evidence of a positive straight leg raising test, the medical record contains sufficient evidence to support the ALJ's conclusion that Stopa did not meet her burden of establishing an impairment that meets, or medically equals, the requirements of Listing 1.04. *Id.*

The additional medical evidence Stopa relies on to prove the severity requirements of Listing 1.04, includes the following: Dr. Sohn's interpretation of the November 2012 MRI; Dr. Beiner's evaluation on February 18, 2018; and Dr. Paggioli's evaluation in November of 2013. With respect to Dr. Sohn's interpretation of the November 2012 MRI, Stopa correctly asserts that Dr. Sohn found a disc bulge at L4-5 and L5-S1, with more of a central disc protrusion at L5-S1 with HIZ. Exhibit 15F, Dr. Sohn Clinical Note, R. at 785. In the report, Dr. Sohn goes on to say that there are mild degenerative changes at L4-5 and L5-S1, minimal spinal and bilateral foraminal stenosis, and no canal stenosis. To meet the requirements of Listing 1.04, Stopa must

show evidence of compromise of a nerve root or the spinal cord with lumbar spinal stenosis resulting in pseudoclaudication. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A. Because Dr. Sohn determined that Stopa suffered minimal spinal stenosis, and found no pseudoclaudication, the medical findings do not equal in severity all of the requirements of Listing 1.04. Based on the clinical and diagnostic evidence, the ALJ reasonably concluded that Stopa had not satisfied the severity requirements of the listed impairment. Exhibit 15F, Dr. Sohn Clinical Note, R. at 785.

Next, Stopa points to Dr. Beiner's impression on February 18, 2013, which notes that Stopa's complaints are "likely related to an annular tear at L5-S1." Exhibit 8F, Dr. Beiner's Evaluation, R. at 691. The imaging results from the office visit are as follows:

> Lumbar views . . . demonstrat[e] a dynamic angular instability at L4-L5, but no anterolisthesis [and] . . . no spondylolysis. There is no obvious neural impingement on the myelogram. On MRI scan, she has disk degeneration at L4-L5 and L5-S1. At L5-S1 there is a small central annular tear/disk bulge/protrusion, depending on the report.

*Id.* The burden of proof is on Stopa to present evidence that she satisfies all of the Listing requirements. See *Ruiz v. Apfel*, 26 F. Supp. 2d 357, 367 (D. Conn. 1998). "For a claimant to show that [an] impairment matches a listing, it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). To meet the requirements of Listing 1.04, Stopa must show compromise of a nerve root or the spinal cord with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. Here, Dr. Beiner's clinical findings failed to support a determination that Stopa's impairment met or medically equaled the requirements of the Listing for disorders of the spine because he failed to document any evidence of nerve root compression, arachnoiditis or spinal stenosis resulting in pseudoclaudication. Therefore, I find that the ALJ's determination that Stopa failed to meet Listing 1.04 is supported by Dr. Beiner's evaluation on February 18, 2013.

Finally, Stopa relies on the findings of Dr. Paggioli, a pain specialist, to bolster her claim of disability. During an office visit on November 12, 2013, Dr. Paggioli observed Stopa grimacing, moving slowly, and jumping when areas of her back were pressed lightly. Although Dr. Paggioli noted that Stopa's mobility was poor and she used crutches to ambulate, he was cautious of Stopa's "many Waddell's signs." Ex. 9F, Dr. Paggioli's Evaluation, R. at 692. "Waddell's signs are 'a clinical test for patients with low back pain that can be used to indicate whether the patient is exaggerating symptoms.'" *Evans v. Colvin*, 649 F. App'x 35, 40 (2d Cir. 2016) (quoting *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 420 (6th Cir. 2008)). The ALJ did not reference Stopa's Waddell's signs to discredit her testimony regarding the use of ambulatory devices. Instead, the ALJ focused on the fact that ambulatory devices were never prescribed by any of Stopa's treating physicians.[8] The Second Circuit has held that "the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; [s]he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The ALJ cited three reasons for discrediting Stopa's statements regarding her reliance on ambulatory devices. First, there is no evidence in the medical record of a prescription or a recommendation for an assistive device. ALJ Decision, R. at 34. Second, Stopa's primary treating physician noted "in a medical source statement that [Stopa] did not need a cane to ambulate." *Id.* Finally, the ALJ noted that Stopa appeared at the hearing without an ambulatory device. *Id.* The ALJ reasonably could conclude that, based on

---

[8] "[T]he claimant noted that she relied on crutches from an old knee injury in her activities of daily living statement, there is no indication of a prescription for an assistive device. . . The lack of a prescription for an ambulatory device diminishes the claimant's credibility, especially when considering the normal physical examinations in both the treatment notes and hospital reports."

the evidence, Stopa's claim that "she relied on crutches from an old knee injury," was not credible. *Id.*

Stopa also relies on Dr. Paggioli's interpretation of her November 2012 MRI to support her claim that she "may meet or equal the listing with or without neurological defects." Mem. Opp. Doc. 21-1, at 7. Dr. Paggioli's assessment of the November 2012 MRI, however, aligns with the other treating physicians' assessments, in that he made no finding of nerve root or spinal cord compromise as required by Listing 1.04. Although the evidence is relevant to Stopa's condition, it is cumulative of what is already in the record. It should be noted that Dr. Paggioli recommended surgery, including a two-level fusion of the L4-L5 and L5-S1 vertebrae "given that [Stopa] has failed multiple forms of conservative treatment and she cannot function." Ex. 9F, Dr. Paggioli's Evaluation, R. at 693. Nonetheless, considering the record as a whole, there is enough relevant evidence to adequately support the ALJ's conclusion that Stopa's treatment was "essentially routine and conservative." ALJ Decision, R. at 33. Accordingly, I perceive no error in the ALJ's conclusions and find that there is substantial evidence that Stopa failed to meet the requirements of Listing 1.04.

## 2. *Did the ALJ Omit An Applicable Listing?*

The ALJ evaluated Stopa's impairments under the relevant listing for degenerative disc disease – Listing 1.04. Stopa now alleges, for the first time, that her back condition "may meet or equal" the requirements of Listing 1.00(B)(1). She does not set forth any evidence, however, that would support that assertion. Assuming, arguendo, that the ALJ should have evaluated Stopa's impairments under Listing 1.00, Stopa's impairment does not satisfy the severity requirements for a disorder of the musculoskeletal system. "In considering whether a plaintiff is disabled by a disorder of the musculoskeletal system, loss of function is defined as 'the inability

to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason including pain associated with the underlying musculoskeletal impairment.'" *Meyers v. Astrue*, 681 F. Supp. 2d 388, 401 (W.D.N.Y. 2010). "Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, App. 1. Here, Stopa has not proven that her impairment has impacted her ability to ambulate to the extent required by the listings. Dr. Tobin's Medical Source Statement indicates that Stopa "[c]an ambulate without using a wheelchair, walker, or 2 canes or 2 crutches." Exhibit 16F, Dr. Timothy Tobin, Medical Source Statement, R. at 800. Moreover, according to Dr. Tobin, Stopa can perform a variety of activities without the need of assistance." *Id*. With respect to Stopa's ability to use her hands, Dr. Tobin reported that she could reach, handle, finger, feel, and push or pull frequently, with both hands. *Id.* at 797. At this point, Stopa has not met her burden of proof that her impairment is severe enough to interfere with her ability to perform basic work activities.

3. *Was the ALJ's Step Three Legal Analysis Insufficient?*

Stopa argues that the ALJ failed to set forth any analysis of, or explanation for, her finding that Listing 1.04 was not satisfied. At step three of her analysis, the ALJ concludes, without further explanation, that "[Stopa's] condition does not satisfy the severity requirements of this listed impairment, as she does not have the requisite neurological defects." The Second

Circuit nonetheless has held that "the absence of an express rationale does not prevent . . . upholding the ALJ's determination regarding appellant's claimed listed impairments, since portions of the ALJ's decision and the evidence before [her] indicate that [her] conclusion was supported by substantial evidence." *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982). Hence, remand for clarification is not necessary if I am able to look to other portions of the decision and to "clearly credible evidence" in the record to determine that the ALJ's decision was supported by substantial evidence. *Id.* at 468-69. See *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112 (2d Cir. 2010).

Here, although the ALJ should have provided a more detailed explanation for concluding that Stopa's condition did not satisfy the requirements of Listing 1.04, the residual functional capacity portion of the ALJ's decision supports her conclusion by carefully considering and incorporating test results, treatment notes, physician assessments, along with Stopa's own testimony, in the analysis. ALJ Decision, R. at 33. Because portions of the ALJ's decision indicate that her conclusion was supported by substantial evidence, and I am able to "glean the rationale of the ALJ's decision," remand is not warranted. *Salmini*, 371 F. App'x 109, 112 (2d Cir. 2010). Nonetheless, the ALJ is reminded that the Second Circuit has "cautioned that an ALJ 'should set forth a sufficient rationale in support of [her] decision to find or not to find a listed impairment.'" *Id.*

C. Issue Two – Credibility Analysis

1. *Did the ALJ err when she found that Stopa's testimony regarding the intensity, persistence and limiting effects of her symptoms was not entirely credible?*

When evaluating the credibility of a claimant's testimony, in addition to considering the objective medical evidence in the record, the ALJ must consider the following factors:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Titles II & Xvi: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7P, 1996 WL 374186 at *3 (S.S.A. July 2, 1996).

"Credibility findings of an ALJ are entitled to great deference and . . . can be reversed only if they are 'patently unreasonable.'" *Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997). In the instant case, the ALJ found Stopa's testimony regarding the extent of her physical limitations not entirely credible. Not surprisingly, Stopa takes issue with the ALJ's analysis of her credibility and claims of pain. In her credibility assessment, the ALJ considered many of the factors listed in SSP 96-7p. First, she discussed what she viewed as inconsistencies with the objective medical evidence and treatments. ALJ Decision, R. at 33. Specifically, the ALJ referenced several diagnostic tests (i.e., MRI, myelogram, electromyography) that evidence "only mild degenerative disc disease at L4-5 and L5-S1 levels." *Id.* Next, the ALJ notes Stopa's "routine and conservative treatment" that consisted of chiropractic manipulations, physical therapy, and epidural injections. The ALJ also referenced documented measures, other than treatment, that Stopa used to relieve pain. For

instance, Stopa was seemingly "doing fairly well with exercises," and her "back pain had improved with swimming with her children." *Id.*

There is substantial evidence in the record to support the ALJ's finding that Stopa's activities of daily living (such as driving her children to and from school, grocery shopping, preparing simple meals, and homeschooling her children), as well as her lack of effort in seeking appropriate treatment for her pain (such as the two-month gap in physical therapy[9]) and the types and dosages of medication taken (Stopa's pain medications included Ibuprofen, Cymbalta and Percocet, which she took "on occasion"[10]), contradicted her testimony at the hearing concerning the degree of limitations to her daily activities, as well as the disabling pain she claimed to experience.

An ALJ is not required "to explicitly reconcile every conflicting shred of medical testimony" in her findings. *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981). In evaluating Stopa's credibility, the ALJ considered relevant evidence in the record, including the medical evidence, Stopa's activities of daily living, the extent of her treatment, including her medications, and Stopa's own inconsistent statements about her symptoms. The ALJ then considered whether Stopa's alleged functional limitations were consistent with the evidence of record. The ALJ determined that the objective evidence was inconsistent with Stopa's allegation of total disability. Accordingly, the ALJ determined that Stopa's testimony regarding her

---

[9] "The physical therapy notes from March 26, 2013, indicate that the claimant was doing fairly well with exercises; however the claimant's physical therapy was reportedly disrupted and she was noted to be on hiatus due to personal-social problems at home." (citations omitted). ALJ Decision, R. at 33.

[10] On February 21, 2013, Stopa returned to Dr. Tobin who noted that Stopa had improved. Exhibit 7F, Dr. Timothy Tobin, Progress Note, R. at 592. Stopa's pain medications included Ibuprofen and Percocet, which she took "on occasion." *Id.* Stopa reported that her back discomfort was not as severe as reported initially, and she was able ". . . to transport the kids to school and do most of her usual household activities." *Id.* On March 11, 2013, Dr. Tobin noted that "[s]he continues to have back discomfort although that is not as severe." *Id.* at 589. On March 25, 2013, Dr. Tobin documented that "Stopa is feeling much better. Her back still bothers her quite a bit . . . [s]he actually is a little bit more active now than she was." *Id.* at 587.

limitations was not entirely credible.  ALJ Decision, R. at 35.  Because there is substantial

evidence to support that determination, the ALJ's credibility assessments are not "patently

unreasonable." *See Pietrunti*, 119 F.3d at 1042.  Therefore, I do not find error with the ALJ's

appraisal of Stopa's credibility.

   D.  Issue Three - Anxiety

   1.  *Did the ALJ fail to properly consider Stopa's claim of anxiety as a disabling factor in her sequential analysis?*

   Regarding the second step, Stopa claims that she suffers from the impairment of anxiety,

which is a condition listed in 20 C.F.R. Part 404, Subpart P, App. 1, § 12.06.   In similar cases,

the Second Circuit has determined that to meet the requirements of a mental disorder impairment

"the claimant must present reports from psychiatrists and psychologists, based upon clinical

findings." *Schweiker*, 675 F.2d at 468.  Here, Stopa has failed to present any clinical findings

that meet or equal in severity the requirements of Appendix 1.  The record does not show that

Stopa's anxiety or depression led to extreme or marked limitations of: 1) understanding,

remembering, or applying information; 2) interacting with others; 3) concentrating, persisting, or

maintaining pace; or 4) adapting or managing herself, as required by 12.06.  *See* 20 C.F.R. Part

404, Subpart P, App. 1, § 12.06(B).  There is no record of treatment notes from a mental health

practitioner, and there is no evidence of a marked restriction in Stopa's daily activities.  Quite the

contrary, Stopa testified that she is the primary caregiver for her three children.  Tr. of ALJ Hr'g,

R. at 80.  She also testified that she homeschools two of her children.  *Id*. at 81.  As part of her

devised curriculum, Stopa testified that she goes on field trips with her children about once a

month.  *Id*. at 85.  The evidence in the record indicates that Stopa's limitations, if any, were mild.

   Under the circumstances in this case, I find that the ALJ did not commit reversible error

by not considering Stopa's anxiety in step two of the sequential analysis.  Because there is little

indication in the record suggesting a disabling mental disorder during the period in question, the ALJ was not obligated to develop the record further. The record indicates that Stopa was prescribed medication for symptoms of anxiety and depression by her primary care physician. Dr. Tobin's treatment notes, however, indicate that she was "feeling well," and "better able to cope with [stress]," thus negating the "serious and persistent" requirement of 12.06. Exhibit 21F, Dr. Timothy Tobin, Progress Note, R. at 958.

On October 11, 2013, Stopa filed a Title II application alleging disability beginning October 26, 2012. The Initial Disability Determination Explanation documents a communication that occurred in December of 2013, when Stopa was asked about the anxiety diagnosis noted in her medical record. Exhibit 2A, Disability Determination Explanation, R. at 113. During the conversation, Stopa indicated that she was temporarily taking an antidepressant, but "mental health is not currently an impairment." *Id*. The conversation is corroborated by the medical record, which indicates that Stopa asked Dr. Tobin to discontinue the antidepressant in September of 2013. Exhibit 7F, Dr. Timothy Tobin, Progress Note, R. at 569. Finally, the Medical Source Statement completed by Dr. Tobin is limited in its scope to physical limitations that affect Stopa's ability to perform work-related activities. Dr. Tobin does not mention either anxiety or depression as impairments that might affect work-related activities. Hence, I conclude that the ALJ did not err with respect to her treatment of the anxiety evidence.

## III.    Conclusion

In spite of the ALJ's failure to explain her reasoning at step three of the sequential analysis, I was able to look to other portions of the ALJ's decision, and to the medical records as a whole, to determine that her decision was supported by substantial evidence. Stopa's motion for an order reversing and remanding the Commissioner's decision (Doc. 21) is denied and the

Commissioner's motion to affirm that decision (Doc. 22) is granted. The clerk shall enter

judgment and close the file.

So ordered.

Dated at Bridgeport, Connecticut, this 21st day of September 2018.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge